# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-01799-SCT

*MEMPHIS HARDWOOD FLOORING COMPANY*

*v.*

*JAMIE SWANN DANIEL*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/30/1999 |
| TRIAL JUDGE: | HON. DONALD B. PATTERSON |
| COURT FROM WHICH APPEALED: | UNION COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | LAWRENCE D. WADE |
| | LESTER F. SUMNERS |
| ATTORNEYS FOR APPELLEE: | THOMAS HENRY FREELAND, III |
| | JAK McGEE SMITH |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 11/22/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/13/2000 |

**BEFORE PITTMAN, P.J., MILLS AND WALLER, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. On January 26, 1996, the Union County Chancery Court issued a temporary restraining order against Northern Hardwood, Inc. (Northern); Lucky Easley, its vice-president and secretary; and Memphis Hardwood Flooring Company (Memphis) to stop the cutting and removal of timber from the property of Jamie Swann Daniel. This T.R.O. was subsequently dissolved, and a motion for preliminary injunction was denied; however, upon reconsideration, the chancellor granted the preliminary injunction. In addition to the injunction, Daniel initially sued to set aside for fraud a November 1995 timber deed from Daniel to Northern and one from Northern to Memphis and for statutory damages for the cutting of her timber without her consent. Memphis cross-claimed against Northern, Easley, and William Heppler, Northern's president, for breach of warranty of its timber deed and indemnity for any sums awarded Daniel.

¶2. On January 30, 1997, Northern, Easley, and Heppler were indicted by a Union County grand jury for the alleged embezzlement of $133,347.40 from Daniel. Daniel subsequently amended her complaint, adding a claim against Heppler, Easley, and Northern for actual and punitive damages for breach of her May 1994 timber contract with Northern. Easley filed for bankruptcy, and the proceedings were stayed as to him.

¶3. Following a trial, the chancellor ultimately found that Memphis, Northern, and Heppler had committed fraud in the procurement of the November 1995 timber deeds from Daniel and that she was entitled to

cancellation of both timber deeds. For Memphis, Northern, and Heppler's wrongdoings surrounding these November 1995 timber deeds, Daniel was awarded statutory damages as provided in Miss. Code Ann. § 95-5-10(1) (1994) in the amount of $573,906.42; attorneys' fees in the amount of $118,885.46; expert witness fees in the amount of $21,325; reforestation costs in the amount of $25,000; damages for injuries to her land in the amount of $71,100; and interest at 6% per annum from the date of judgment. Thus, the award to Daniel for her claim surrounding the November 1995 timber deeds totaled $810,216.88. The preliminary injunction was made permanent, and Memphis' cross-claim was dismissed with prejudice.

¶4. Judgment was entered May 3, 1999. Heppler and Easley entered into a non-adjudication agreement with the State of Mississippi on the criminal charges brought against them dealing with these proceedings. They pled guilty to the crime of embezzlement and agreed to make restitution in the amount of $250,000 to Daniel for damages related to the May 1994 timber deed. Daniel then settled with Heppler, Easley, and Northern. The parties agreed that if the restitution order as to the May 1994 timber deed is satisfied, payment of the additional sum of $100 will release Heppler, Easley, and Northern from any obligations as to the November 1995 timber deeds. An amended judgment reflecting this agreement and correcting an error in calculations was entered on September 30, 1999. Memphis timely perfected this appeal.

## STATEMENT OF FACTS

¶5. Jamie Swann Daniel, a retired schoolteacher who was eighty-five years old at the time of the trial of this case, owns approximately 800 acres in Union County. The land is divided by Wilhite Creek into a north tract and a south tract. She lives on the north tract. The tract immediately south of Wilhite Creek, where her best timber was found, contains about 243 acres. A third tract, known as "Darling Crossroads," lies about six miles south of the south tract and contains approximately 140 acres. A large part of this land, particularly the 243 acres and Darling Crossroads, was in timber.

¶6. A January 1994 ice storm in North Mississippi damaged some of Daniel's timber. After the ice storm, Lucky Easley contacted Daniel about cutting her timber. He and William Heppler made a video tape of the damaged timber on the 243 acres south of Wilhite Creek, showed the tape to Daniel, and convinced her to allow some cutting of the storm-damaged timber. Easley and Daniel reached an unrecorded written agreement on May 19, 1994, allowing Northern to cut the "disaster hardwood timber" on the 243 acres which was 20 inches in diameter and up. Eventually this agreement was verbally extended to include the same width of trees on the Darling Crossroads tract. Regarding that part of the litigation surrounding the May 1994 contract the chancellor found:

> In summary the evidence is overwhelming that (1) Northern sold $498,905 worth of timber cut from plaintiff's property under its May 19, 1994 contract; (2) plaintiff's 60% share was $299,343; (3) Heppler and Northern paid plaintiff $134,000; (4) $165,343 that belonged to plaintiff was wrongfully and fraudulently appropriated and converted by Easley, Heppler, and Northern.

As mentioned above, Daniel ultimately settled with Northern, Easley, and Heppler as to their liability on this May 1994 timber contract. That settlement provided for satisfaction of Daniel's claim against all parties but Memphis regarding the November 1995 timber deeds.

### Negotiations Surrounding the November 13, 1995, Timber Deeds

¶7. Sometime before November 1995 Easley approached Daniel about cutting more of her timber. Daniel

agreed to the cutting of the timber remaining on the south tract and Darling Crossroads. This is the area which had previously been cut down to 20 inches. Daniel now agreed to have it cut down to 16 inches. Easley testified that Daniel told him to cruise the entire 800-acre farm. Daniel's testimony was that Easley was not to cruise any timber north of Wilhite Creek except twenty acres which she intended to sell to a neighbor but did not intend to cut.

¶8. Rome Yarbrough and Robert Luther were Memphis' timber buyers at its Potts Camp mill and the agents who dealt with Easley regarding the timber purchases in question. Easley, Luther, and Yarbrough met on Daniel's land in late October or early November 1995. Memphis contends that Easley told Yarbrough that he had bought all of Daniel's timber and had a deed to it. To the contrary, Easley claimed he only told them that he had an agreement but "didn't have anything on paper." Luther's testimony supports Easley's assertion by acknowledging Luther's awareness that "[Easley] didn't have it bought."

¶9. Contrary to the chancellor's findings, Memphis denies that Luther and Easley agreed that Easley would act for both Northern and Memphis to buy Daniel's timber for Northern while concealing from Daniel that Northern was actually buying for Memphis.

¶10. Luther volunteered the following testimony in his deposition and acknowledged in his trial testimony that he had so testified:

Q: In other words, you wanted to get together with Mr. Easley, and between the two of you, you hoped you could buy her timber?

A: Well that's right.

Q: Mr. Easley was making the deal for you and for Memphis Hardwood.

A: Right.

Q: You didn't tell him you wanted to buy all of the timber.

A: Well, I told him I wanted to buy a whole tract of timber that she owned.

Q: That's all of the timber.

A: Down to a stump size and merchantable pine.

Q: Down to a stump size of 16 inches.

A: And merchantable pine.

* * *

Q: I'm asking you what you and Mr. Easley agreed on and y'all agreed he was going out and buy the timber in the name of Northern Hardwood and what was your answer?

A: Yep.

Q: Next question: Not Memphis Hardwood?

A: That's right.

Q: Question: and the whole idea was she would think she was selling the timber to Memphis Hardwood-I'm sorry, I mean to Northern Hardwood not Memphis Hardwood; that was the whole idea and your answer?

A: Yep.

¶11. Easley testified in deposition that he told Luther the title had to first go from Daniel to Northern and then from Northern to Memphis.

Q: And Mr. Luther was asked this question, the whole idea was she would think she was selling the timber to Northern Hardwood, and he responded that was the idea. Was that your idea too, she was to think she was selling this timber to Northern Hardwood?

A: No.

Q: She wasn't to think that?

A: She did. . .

Q: Who?

A: She did sell it to Northern Hardwood.

Q: Right. And that's what you wanted her to think she was doing. That's why you had the deed made out that way, correct?

A: Yes. Yes. Yes.

¶12. After Luther and another Memphis employee cruised the timber on all of Daniel's land, Luther offered Easley $400,000 for the timber. Easley countered with $410,000, and Luther accepted. Easley testified that when Luther agreed to pay $410,000 for Daniel's timber, Daniel had already agreed to sell it to Easley for $150,000. Easley admitted he told Daniel nothing about the fact he was going to sell the timber to Memphis that very same day for more than double what he was paying her.

### Execution of the November 13, 1995, Timber Deeds

¶13. The deed conveyed, against Daniel's instructions, the timber down to a stump size of 16 inches on all of her land as opposed to only that land south of Wilhite Creek. In addition to conveying more timber than Daniel intended, the deed failed to include a non-assignment clause. Though she signed the deed without reading it, Daniel testified that she would not have done so had she known that there was not a provision preventing assignment. Daniel drove to Baldwyn to have the deed notarized, returned to her home where Easley was waiting, and gave the signed deed to him. Easley traveled to Memphis' Potts Camp office where he signed the second deed and gave both deeds to an employee. He was given two checks: one to Northern for $400,000 and one to himself for $10,000.

¶14. Memphis sold Stan Wilson, a timber buyer specializing in white oak who was familiar with the Daniel timber, $41,511 of veneer logs on December 29, 1995, and began cutting Daniel's other timber the first

week of January 1996. The cutting continued until the preliminary injunction was granted on April 1, 1996.

¶15. Memphis asserts that prior to the November 13, 1995, timber deeds, which are the primary subjects of this appeal, Daniel agreed to sell all of her timber to Northern. This contention is based on a series of contracts between Northern and Wilson. In the last of these contracts, Northern sold to Wilson additional timber off Daniel's property south of Wilhite Creek. Memphis alleges that on this contract is evidence that at the time of the agreement (March 1995) Northern had contracted to buy the timber on Daniel's entire 800-acre property. The second paragraph of this document states, "Plus all veneer w.o. [white oak] starting fall 1995 on bal. of property of Ms. Jamie Daniel. Price to be arrived to this fall in case of marked change." Memphis asserts that "bal." refers to the balance of Daniel's 800 acres, not just the balance of the three tracts which had been previously cut.

¶16. Further, Memphis asserts that in a document dated October 3, 1995, Daniel agreed to sell Easley the timber on her entire 800-acre farm. Daniel denies signing the document in question which was offered into evidence by Northern. A document expert testified that the signature and initials on this copy matched the exemplars written by Daniel. However, the expert also testified that for various reasons, including that this was a multi-generation Xerox copy, he could not say that Daniel actually signed the document; nor could he say that her signature was not traced. The court ruled that the exhibit was admissible on behalf of Memphis. The court noted, however, that in any event, this exhibit was obviously not the final agreement since it called for a percentage payment, whereas the agreement reached by Easley and Daniel was for a lump sum payment of $150,000. Thus, assuming arguendo the instrument is authentic, it is not the instrument Memphis seeks to enforce here. Rather, those instruments are the November 13, 1995, timber deeds.

¶17. The chancellor found a confidential relationship existed between Easley and Daniel; that Easley thus owed fiduciary duties to Daniel with reference to the timber deeds; and that Easley was guilty of fraud, even if there was no confidential relationship. The court further found that the consideration of $150,000 which Easley paid Daniel for her timber was grossly inadequate and in and of itself proof of fraudulent intent. The chancellor also found that Memphis participated in the perpetration of frauds on Daniel and is equally guilty of defrauding her. In so holding the chancellor stated, "Memphis' claim that it was not astride the horse of fraud may be so, but the evidence is clear that its left foot was in the stirrup, and that's sufficient to destroy its claim of innocent purchaser without notice." He determined that Daniel was entitled to a cancellation of both the deed from Daniel to Northern and the deed from Northern to Memphis. Judgment was entered, and Memphis timely perfected this appeal, assigning the following points of error:

> **I. THE CHANCELLOR ERRED IN AWARDING DOUBLE DAMAGES UNDER § 95-5-10 OF THE MISS. CODE ANN. WHERE PLAINTIFF CONSENTED TO SELL THE TIMBER IN QUESTION BY THE EXECUTION OF A TIMBER DEED AND APPLYING § 95-5-10 TO THOSE TREES HARVESTED BY MEMPHIS HARDWOOD WHICH PLAINTIFF ADMITTED SHE INTENDED TO SELL LOCATED ON HER LANDS SOUTH OF WILHITE CREEK.**

> **II. THE CHANCELLOR ERRED IN FINDING MEMPHIS HARDWOOD WAS NOT A BONA FIDE PURCHASER FOR VALUE, AND THE JUDGMENT OF THE COURT IS CONTRARY TO THE OVERWHELMING WEIGHT OF THE CREDIBLE EVIDENCE.**

> **III. THE CHANCELLOR ERRED IN FINDING THAT MEMPHIS HARDWOOD AND NORTHERN HARDWOOD, INC., WERE INVOLVED IN A JOINT VENTURE**

**JUSTIFYING THE DISMISSAL OF MEMPHIS HARDWOOD'S CROSS-CLAIM.**

## STANDARD OF REVIEW

¶18. The findings of a chancellor will not be disturbed or set aside on appeal unless the decision of the trial court is manifestly wrong and not supported by substantial credible evidence or unless an erroneous legal standard was applied. *Carrow v. Carrow*, 741 So. 2d 200, 202 (Miss.1999). Where there is substantial evidence to support the chancellor's findings, this Court is without the authority to disturb his conclusions, although this Court might have found otherwise as an original matter. *Dew v. Langford*, 666 So. 2d 739, 742 (Miss. 1995) (citing *In re Estate of Harris*, 539 So. 2d 1040, 1043 (Miss. 1989)).

## ANALYSIS

### I. THE CHANCELLOR ERRED IN AWARDING DOUBLE DAMAGES UNDER § 95-5-10 OF THE MISS. CODE ANN. WHERE PLAINTIFF CONSENTED TO SELL THE TIMBER IN QUESTION BY THE EXECUTION OF A TIMBER DEED AND IN APPLYING § 95-5-10 TO THOSE TREES HARVESTED BY MEMPHIS HARDWOOD WHICH PLAINTIFF ADMITTED SHE INTENDED TO SELL LOCATED ON HER LANDS SOUTH OF WILHITE CREEK.

¶19. Memphis contends that under the facts of this case § 95-5-10 does not apply. This section applies only "if any person cuts, deadens, destroys, or takes away any tree without the consent of the owner. . . ." Miss. Code Ann. § 95-5-10 (1994). Pointing to this language, Memphis asserts that it harvested Daniel's timber under the properly-documented consent of the former timber owners. Daniel asserts that fraud in the procurement of the timber deeds vitiates her consent and renders the deed voidable.

¶20. The chancellor found that both timber deeds were void as the result of fraud in their procurement. To arrive at this result, the court found that Easley was acting as agent for both Northern and Memphis, that he had developed a fiduciary relationship with Daniel, that he breached that relationship, and that Memphis was equally guilty of fraud. The court further held that, even in the absence of a fiduciary relationship, Easley committed fraud upon Daniel.

¶21. A fiduciary relationship may arise between parties to a contract where the parties share a mutual interest in obtaining the results called for in the contract. *Parker v. Lewis Grocer Co.*, 246 Miss. 873, 153 So. 2d 261, 276 (1963). Easley and Daniel's fiduciary relationship arose from the fact that both Northern and Daniel had a mutual interest in the performance of the May 19, 1994, timber contract. This fiduciary relationship did not end there, however. The evidence supports the chancellor's finding that Daniel had placed trust in Easley, that she was well-satisfied with the manner in which her timber had been previously harvested, and that she was not willing for any other timber to be cut except under Easley's supervision. Her attitude and Easley's deception are summed up in their parting words on November 13, 1995, when she told him he had done a good job in taking care of her land and trees and that she was expecting the same under the new contract. Easley responded, "Yes, Mrs. Jamie, I'm going to do it." As noted by one authority,

> It is a well-settled principle of the law of fraud, applied particularly by courts of equitable jurisdiction, that it is the duty of a person in whom confidence is reposed by virtue of the situation of trust arising out of a confidential or fiduciary relationship to make a full disclosure of any and all material facts

within his knowledge relating to a contemplated transaction with the other party to such a relationship, and any concealment or failure to disclose such facts is a fraud.

37 Am. Jur. 2d *Fraud & Deceit* § 149, at 205 (1968) (footnote omitted). Easley had a fiduciary duty to disclose fully to Daniel the following: (1) that the November 13, 1995, deed included the timber on all her land; (2) that once the deed was signed, Northern was free to convey the timber to any third party it chose; (3) that he would have nothing to do with supervising the cutting of her timber; (4) that he already had sealed a deal with Memphis and would convey the timber to Memphis that very day; and (5) that, although he was paying her only $150,000 for the timber, he would receive $410,000 for it later that day. Easley accomplished none of these requirements and, in failing to do so, breached the relationship and was guilty of fraud. Further, he was guilty of fraud even in the absence of a fiduciary relationship because he misrepresented that the deed was similar to the May 1994 agreement, which prohibited an assignment, and because he misrepresented that he would supervise the cutting.

¶22. The fact that Daniel signed the contract without reading it is of no consequence under the facts of this case. We held in ***Baggett v. Furst Corp.***, 357 So. 2d 321, 322-23 (Miss. 1978), that where grantors are deceived into signing a conveyance without having read it due to the fraudulent representations of the agent for the grantee as to the contents and effect of the instrument, the conveyance may be canceled by the grantor.

¶23. Memphis argues that the parol evidence rule prohibits Daniel from testifying to what Easley told her regarding the timber deed because such testimony is contrary to the deed's language. This argument is misplaced. In ***Brown v. Ohman***, 42 So. 2d 209, 213 (Miss. 1949), we found that there is an exception to the parol evidence rule in actions alleging fraud and deceit. We distinguished two situations in which fraud may arise in the procurement of a contract and held that parol evidence is admissible to prove either instance. *Id.* at 212. We stated:

> Actions for the recovery of damages for fraud and deceit are usually based upon misrepresentations which amount to fraud in inducing a party to enter into a contract as contrasted with fraud in procuring a signature to and thereby completing the execution of the contract, and the law is well-settled that parol evidence is admissible to prove fraud and misrepresentations in either instance.

*Id.*

¶24. The record in the present case supports the finding that Daniel was the victim of both instances of fraud. Easley induced Daniel to enter into the contract by misrepresenting to her that she was selling to Northern. He admitted that he told her nothing about the fact that he was going to sell the timber to Memphis the same day for more than double what he was paying her. Easley knew of Daniel's wishes regarding her property, her timber, the cutting, and the deed. He knew she wanted no assignment. He knew she did not intend to cut any timber north of Wilhite Creek. He disregarded her intentions and misrepresented that he had honored them. To procure a signature from Daniel, Easley presented her with the document folded over to its back page where she was to sign. She testified that he hurried her through this process and told her that the document was similar to the May 1994 agreement with which she had been pleased. Daniel had been dealing with Easley since late February 1994. She testified that he had taken care of her property and that she was satisfied with the previous cutting. She told him, "I'm expecting the same thing out of you this time," to which he replied, "Yes, Ms. Jamie, I'm going to do you a good job."

¶25. Also supported by the record is the chancellor's finding that the defrauding of Daniel was a combined effort of Northern, Easley, and Memphis. In *Woodruff v. Bates*, 210 Miss. 894, 904, 50 So. 2d 559, 563 (1951), Wanete Oil Company and Nathan Kalvin agreed to combine efforts to obtain a mineral interest in certain property through the activities of Wanete's agent, Woodruff. Woodruff subsequently defrauded the grantors of the interests involved. *Id.* at 903, 50 So. 2d at 562. We held that Woodruff acted for both Wanete and Kalvin and, therefore, affirmed the chancellor's decree against both parties, even though Kalvin contended to be an innocent purchaser for value without notice. *Id.* at 904, 50 So. 2d at 563.

¶26. In the case sub judice the record reveals that Memphis agreed specifically that Easley would act in its behalf in representing to Daniel that Northern was the ultimate purchaser of her timber, though in truth the purpose of the scheme was to acquire the timber for Memphis. Thus, Easley became the joint agent-the "Woodruff"-for Northern and Memphis. Further, because Memphis agreed specifically that Easley would act in its behalf, an even stronger case exists against Memphis than was present against Kalvin in *Woodruff*. In *Woodruff*, Kalvin's role was entirely passive in that he had no involvement with the agent's procurement of the deed from the grantors. The fraud found there could, thus, be characterized as "constructive fraud." *See, e.g.*, *Tyson v. Moore*, 613 So. 2d 817, 823 (Miss. 1992).

¶27. The record in the present case, however, supports a finding of fraud in fact. Luther's and Easley's testimony reveals that Memphis agreed to allow Easley to act in its behalf in acquiring Daniel's timber by whatever means necessary. Luther testified as follows:

Q: Mr. Luther, did you place any restrictions on Mr. Easley as to what representations he could make to Mrs. Daniel?

A: No, sir, it was his deal.

Q: Anything he wanted to say to her was okay with you; is that true?

A: I guess so. I mean, I don't know.

Q: Well, let's be sure now. Do you have any question in your mind about that, that whatever he said to her would be okay with you? Do you have any question in your mind about that now?

A: No.

When Yarbrough and Luther met Easley on Daniel's land prior to the purchase, Easley did not show them a deed or any other written agreement evidencing that he or Northern owned Daniel's timber. They were instructed of the necessity that there be two deeds-one from Daniel to Northern and one from Northern to Memphis. Further, Memphis provided for the drafting of these documents which were used to perpetrate the fraudulent scheme. Both deeds were drawn by Memphis' attorney, and Memphis paid for the drafting. Clearly, Memphis had constructive notice, but more likely Memphis had actual notice of the intended fraud and agreed to participate in that fraud.

¶28. Furthermore, the purchase price of $150,000 strongly supports Daniel's contention that she did not intend to sell all of her timber but was defrauded into doing so. We find that the vast gap between $150,000 and $410,000 shocks the conscience under these facts and could stand alone as evidence of bad faith and fraudulent dealing. Memphis denies prior knowledge of the amount Easley paid Daniel. This fact is of no relevance, however, in light of Luther's testimony revealing Easley's authority to act as Memphis' agent

and Memphis' agreement that Easley acquire Daniel's timber by any means necessary.

¶29. Daniel is correct in her assertion that fraud in the procurement of the deeds vitiates her consent and renders the deeds voidable. *See, e.g.*, ***Mullins v. Merchandise Sales Co.***, 192 So. 2d 700, 704 (Miss. 1966) ("[F]raud vitiates everything tainted by it."). The chancellor's decision to cancel the deeds is supported by substantial evidence and is manifestly correct. Therefore, § 95-5-10 is appropriately applied, and double damages are in order.

¶30. The second part to this assignment of error is without merit. Memphis argues that it is error to apply § 95-5-10 to those trees harvested by Memphis which Daniel admitted she intended to sell located on her lands south of Wilhite Creek. Daniel did, in fact, intend to sell some of her timber. However, the fraud committed on her vitiated both her knowing consent to sell the south tract timber as well as her unknowing consent, through the timber deed, to sell all of her timber. The deeds are void. Her consent is gone.

## II. THE CHANCELLOR ERRED IN FINDING MEMPHIS HARDWOOD WAS NOT A BONA FIDE PURCHASER FOR VALUE, AND THE JUDGMENT OF THE COURT IS CONTRARY TO THE OVERWHELMING WEIGHT OF THE CREDIBLE EVIDENCE.

¶31. Memphis claims that it was a bona fide purchaser for value because it paid a valuable consideration for timber in good faith and in the absence of any notice of Easley's fraudulent acts. To the contrary, the chancellor determined that Memphis did not act in good faith and charged it with notice of the plan to defraud Daniel. This finding is supported by substantial evidence and is, therefore, upheld by this Court.

¶32. Memphis' plea that it was a bona fide purchaser for value without notice constitutes an affirmative defense and must be sustained by competent proof. ***Woodruff***, 50 So. 2d at 563. The elements the innocent purchaser must prove are a valuable consideration, the presence of good faith, and the absence of notice. ***Mayes v. Thompson***, 128 Miss. 561, 91 So. 275, 276 (1922). The record supports the chancellor's finding that Memphis failed to establish its bona fide purchaser status.

¶33. The first element is established in favor of Memphis. The record reveals that Memphis paid $410,000 to Northern for the timber.

¶34. The second element, the presence of good faith, was not adequately shown by Memphis. The fact that Easley made the deal with Daniel on behalf of both Northern and Memphis and that Memphis was a knowing participant in this scheme is supported by the testimony of Luther and Easley. Such actions reveal the absence of good faith. Even the circumstances surrounding the drafting of the deeds indicate the joint nature of the scheme and Memphis' lack of good faith. Luther, at the request of Easley, had Memphis' lawyer draft Northern's deed as well as Memphis'. Memphis paid for the drafting of the deed from Daniel to Northern. The closeness in time of the two transactions is a further indication of bad faith.

¶35. The third element is the absence of notice. Constructive notice of the intended fraud suffices. *See, e.g.*, ***Crawford v. Brown***, 215 Miss. 489, 503-04, 61 So. 2d 344, 350 (1952) (holding that whatever fairly places a person on inquiry is sufficient notice, where the means of knowledge are at hand, and one who fails to inquire is then chargeable with all the facts which, by proper inquiry, he might have ascertained); ***First Nat'l Bank v. Johnson***, 177 Miss. 634, 171 So. 11, 14 (1936) (holding same). Even so, in the case sub judice, Memphis was not only on actual notice, it was a knowing and willing participant in the defrauding of Daniel. Thus, Memphis fails to establish the third element. The record supports the chancellor's finding that

Memphis was not a bona fide purchaser.

¶36. Under this assignment of error, Memphis chooses to address the case of ***Gray v. Baker***, 485 So. 2d 306 (Miss. 1986). There we held:

> Where a vendor would not have made a conveyance of land had he known of a prior agreement by the vendee to convey to another the vendor found objectionable, that vendor is entitled to a judicial recision [sic] of the instrument of conveyance. . . . The vendor's rights in his property extend to the right to refuse to sell to such third party for good reason, for bad reason or for no reason at all-so long as he does not act for some legally impermissible reason. . . .

***Id.*** at 308. Memphis contends that if neither Easley, Northern, or Memphis had knowledge that Memphis was an unacceptable or "obnoxious" buyer to Daniel, the rule in ***Gray*** has no application. ***Gray*** held, "What may render that sale voidable is the original purchaser's act of deceit, his failure to disclose to the original seller plans that the property or part thereof will be ultimately conveyed to the obnoxious third party." ***Id.*** at 308. Memphis asserts that the actionable deceit lies in the initial buyer's knowledge of the obnoxiousness of the subsequent buyer. Nowhere in ***Gray*** did this Court state that proposition; nor, would there be any consequence in the present case if we had done so. The record reveals that Easley was aware that Daniel did not want the timber deed transferred. Daniel testified as follows:

> A: Mr. Easley knew that he wasn't to be a middleman. When I sold, I thought it was thoroughly understood that he would work the timber himself.
>
> Q: All right.
>
> A: And as he went out the door when he left with the contract that day and didn't leave me the contract, I said, "Lucky, you've done me a good job in taking care of my roads, my land, and my trees. Now I'm expecting the same thing out of you this time." "Yes, Ms. Jamie, I'm going to do you a good job."

Easley revealed in his deposition testimony that he and Luther, Memphis' agent, had knowledge that Memphis was unacceptable to Daniel. He admitted that he told Luther the title had to first go from Daniel to Northern and then from Northern to Memphis.

¶37. Thus, contrary to Memphis' assertion, ***Gray*** ultimately stands in favor of Daniel. Evidence is found throughout the record that Easley, Northern, and Memphis knowingly practiced deception on Daniel. Memphis has failed to show its bona fide purchaser status. Further, Memphis fails to escape the consequences of the rule in ***Gray***. Therefore, this assignment of error is without merit.

### III. THE CHANCELLOR ERRED IN FINDING THAT MEMPHIS HARDWOOD AND NORTHERN HARDWOOD, INC., WERE INVOLVED IN A JOINT VENTURE JUSTIFYING THE DISMISSAL OF MEMPHIS HARDWOOD'S CROSS-CLAIM.

¶38. The chancellor ruled that because Northern and Memphis were in pari delicto in this matter, Memphis' cross-claim against Northern and Easley was without merit. This finding is not manifestly wrong or clearly erroneous. It is supported by substantial credible evidence and is upheld by this Court.

¶39. The joint nature of this venture between Northern and Memphis and Memphis' liability for the fraud

committed upon Daniel have been discussed above and will not be re-addressed here. The chancellor appropriately dismissed the cross-claim. This assignment of error is without merit.

## CONCLUSION

¶40. The chancellor's findings are neither manifestly wrong nor clearly erroneous. They are supported by substantial evidence. For the foregoing reasons, the judgment of the Chancery Court of Union County is affirmed.

¶41. **AFFIRMED.**

> **PRATHER, C.J., PITTMAN AND BANKS., P.JJ., McRAE, SMITH, WALLER AND COBB, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**